UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIMONE MAURO,

                   Plaintiff,

v.

COUNTY OF MACOMB and
ANTHONY MARROCCO,

                   Defendant.

_____/

Case No. 16-11533

Paul D. Borman
United States District Judge

R. Steven Whalen
United States Magistrate Judge

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MARROCCO'S MOTION FOR SUMMARY JUDGMENT

On March 19, 2012, Plaintiff Simone Mauro was jailed for contempt of court by Macomb County Circuit Judge John C. Foster after Mauro refused to comply with a court order that he transfer the personal property of a business that he partly owned. Defendant Anthony Marrocco was one of the parties adverse to Mauro in the larger litigation of which the contempt proceeding was a component. The next day, Mauro signed over the assets that were the subject of the court order, and he was promptly released.

Mauro later filed suit in the Macomb County Circuit Court under 42 U.S.C. § 1983 against Macomb County and against Marrocco, both in his individual capacity and in his official capacity as Macomb County Public Works Commissioner. Mauro also asserted state-law claims of false imprisonment and

intentional infliction of emotional distress against both defendants. The defendants removed the action from the Macomb County Circuit Court to this Court.

Mauro has dropped his claims against Macomb County and his official-capacity claims against Marrocco. The remaining claims are Mauro's § 1983 claim, his false imprisonment claim, and his intentional infliction of emotional distress claim, all asserted against Marrocco in his individual capacity. As discussed below, Mauro has presented sufficient evidence to pursue his § 1983 claim that Marrocco retaliated against him for engaging in activity protected by the First Amendment. As to all other potential theories of that claim, and as to all other claims asserted, Mauro has failed to demonstrate the existence of a genuine issue of material fact, and therefore Marrocco is entitled to summary judgment.

## I.    BACKGROUND

Mauro's contempt incarceration, which is the primary basis for the claims asserted in this action, occurred amid an ongoing civil dispute in the Circuit Court of Macomb County over real and personal property associated with a golf and country club in Macomb, Michigan. The case ultimately went before the Michigan Court of Appeals, which issued an opinion on April 17, 2014 that sets forth facts relevant to nearly all of Mauro's allegations in this case. *See generally Jode Investments LLC v. Burning Tree Properties, LLC*, No. 310957, 2014 WL 1515267 (Mich. Ct. App. Apr. 17, 2014) (per curiam). As the parties do not appear to dispute

the accuracy of that opinion's account of those facts, the factual recitation that follows will draw principally from the Michigan appellate court's April 14, 2014 opinion.

## A.    Factual Background

In 2004, Mauro, Marrocco, and several others formed two limited liability companies in order to purchase and operate the Burning Tree Golf and Country Club. Burning Tree Properties, LLC ("**BT Properties**") would purchase the real property, and Burning Tree Investors, LLC ("**BT Investors**") would operate the golf course and country club. Mauro and Marrocco each owned stakes in both BT Properties and BT Investors (collectively the "**BT Entities**"), albeit in different capacities: Mauro personally owned 25% of the BT Entities, while Marrocco was a member of a company called Jode Investments, LLC ("**Jode**"), which itself held a 25% stake in the BT Entities. *See Jode Investments*, 2014 WL 1515267, at *1.

The BT Entities financed their purchase of the club with a $3.36 million loan issued by Fifth Third Bank ("**Fifth Third**") in January 2005. The loan was secured by a mortgage on the real property that BT Properties had purchased, and by a security agreement covering all personal property of BT Investors, including its liquor license. The loan was guaranteed by BT Investors and by various individuals affiliated with the BT Entities, including both Mauro and Marrocco. *See id.*

3

The BT Entities defaulted on the loan in early 2009, and Fifth Third acquired the real property for $1.5 million at a foreclosure sale in October of that year. Shortly thereafter, Fifth Third sued the BT Entities and various members of the BT Entities, alleging that all of the guaranties of the loan had been breached, and further alleging that it had the right to take possession of BT Investors' personal property in partial satisfaction of the remaining debt. (After Fifth Third foreclosed on the real property, the remaining debt was approximately $2 million.) *See id.*

In April 2010, Marrocco and Anthony Fanelli (another member of Jode) entered into a settlement agreement with Fifth Third. In exchange for $2.1 million and a release of all claims against it, Fifth Third agreed to dismiss its claims against Marrocco and Fanelli without prejudice to its rights against the other guarantors, including Mauro. Fifth Third also agreed to quitclaim its interest in (or issue a redemption certificate for) the real property in favor of an entity to be named by Marrocco and Fanelli. Finally, Fifth Third agreed to terminate its Uniform Commercial Code financing statements as to BT Investors' personal property, and discharge any interest it had in the liquor license. *See id.* at *2.

Also in April 2010, Burning Tree Properties assigned all of its "right, title, and interest" in the real property, including its redemption rights, to a newly formed

entity called Club Golf Properties, LLC ("**Club Properties**").[1] The assignment was brought about by a group of members who together held a 70% interest in BT Properties: Marrocco, on behalf of Jode Investments; Mauro; and Salvatore DiMercurio, another co-owner of the BT Entities and guarantor of the loan. *See id.*

A few months after settling with Marrocco and Fanelli, Fifth Third separately settled with Mauro and DiMercurio. Mauro and DiMercurio agreed to each execute a deficiency note for $70,000 to cover their respective guaranties, and Fifth Third's claims against them were dropped. *See id.*

The litigation that ultimately led to Mauro's contempt incarceration was initiated in January 2011. The issue in those proceedings that matters for present purposes is the disposition of BT Investors' personal property, including the liquor license.[2].

The lawsuit began when Club Properties and Club Golf (collectively the "**Club Entities**"), filed suit against the BT Entities and also against the three

_____

[1] Club Properties, along with another entity called Club Golf, Inc. ("**Club Golf**"), had been formed earlier in the same month. *See id.* at 2 n.2.

[2] The record is mostly silent as to what BT Investors' personal property consisted of, though the April 2014 opinion of the Michigan Court of Appeals makes repeated reference to the fact that it included BT Investors' liquor license. This is presumably because, at least according to a *Macomb Daily* article published the day after Mauro's release from jail, the liquor license was "[t]he most valuable asset sought . . . in the ongoing court fight . . . . The inability to serve liquor at the clubhouse and banquet room, according to court documents, has hurt the new entity's finances since the business takeover . . . ." (ECF No. 1-2 at 91, Pg ID 96.)

members of the BT Entities besides Jode: Mauro, DiMercurio, and Sergio Gesuale (collectively the "**BT Parties**"). The plaintiffs alleged (*inter alia*) that a dispute had arisen over the dissolution of the BT Entities and the ownership of their property, and asked the court to (*inter alia*) declare that Club Golf owned the personal property formerly owned by BT Investors. *See id.* at *2-3. A few months later, in April 2011, the BT Parties filed a counter-suit against Jode, the Club Entities, Marrocco, and Fanelli (collectively the "**Club Parties**"), which alleged that the Club Parties had wrongfully exercised dominion over BT Investors' personal property. *See id.* at *3. The Club Parties then filed an amended complaint—now including Marrocco and Fanelli among the plaintiffs in addition to Jode and the Club Entities—again seeking dissolution of the BT Entities and a declaration that the Club Entities owned all real and personal property formerly owned by the BT Entities. *See id.* at *3-4. The central issue, at least as to the claims regarding BT Investors' personal property, was whether, under the April 2010 settlement between Marrocco, Fanelli, and Fifth Third, Fifth Third had ever effectively transferred BT Investors' personal property to Marrocco, Fanelli, or Club Golf.

In November 2011, the trial court concluded that the transfer of BT Investors' personal property had indeed been effective, and accordingly granted a motion for partial summary disposition filed by the Club Parties. Then in February 2012, based on that determination, the court ordered the BT Parties to assign BT Investors' liquor

license to the Club Parties. *See id.* at *4-5. The BT Parties moved for reconsideration of that decision on February 13, 2012. A hearing on the motion for reconsideration was scheduled for March 19, 2012. (*See* ECF No. 1-2 at 121-23, 126-28.)

Eighteen days before the scheduled hearing on the BT Parties' motion for reconsideration, on March 1, 2012, the Club Parties filed a Verified Ex-Parte Motion for Order to Show Cause, in which the Club Parties requested that the court issue an order to show cause why Mauro should not be held in contempt for refusing to transfer BT Investors' personal property to the Club Parties, require Mauro to transfer the property, and award attorneys' fees and costs to the Club Parties. (ECF No. 1-2 at 55-61, Pg ID 60-66.) Macomb County Circuit Judge John C. Foster, who presided over the action, entered an Order to Show Cause the same day, ordering Mauro to appear before the court on March 19, 2012—the same date on which the BT Parties' motion for reconsideration had been scheduled to be heard—and to "show cause why he should not be held in Contempt of Court for his continued failure to comply with this Honorable Court's Rulings and Orders, and to show cause why the Court should not grant the additional relief as requested in the Verified Ex-Parte Motion for Order to Show Cause." (ECF No. 1-2 at 53-54, Pg ID 58-59.)

In the course of the March 19, 2012 hearing, Judge Foster held Mauro in contempt, ordered that Mauro be remanded to the county jail until he executed the assignment of the personal property, and ordered him to pay fees and costs. *See Jode*

*Investments*, 2014 WL 1515267, at *5. An article published two days later in the

*Macomb Daily*, which Mauro included as an exhibit to the Complaint in this action,

described the proceedings in the following way:

> Mauro, standing before the judge in a suit and tie, without an attorney present, was hauled off to jail on Monday after [Judge] Foster warned him that he was ordered to sign over the assets months ago. As a deputy led him out of the courtroom, Foster advised:
> "Mr. [Mauro], you have the keys to the jail cell in your hands. All you have to do is sign those documents."
> Before he was led away, Mauro noted that he had "vehemently" disagreed with Foster's past rulings in the case and he called the new motion seeking the imposition of jail and fines "an attempt by Mr. Marrocco to intimidate me and harass me."
> Mauro, who told the court he has filed for personal bankruptcy, added: "Your honor, you expect me to transfer $787,000 in assets to Mr. Marrocco, for no financial consideration?"
> . . .
> Marrocco, who has been battling with the Board of Commissioners in his role as public works commissioner, was pleased with Foster's decision.
> "It's like with the Board of Commissioners, when I'm right, I'm right," he said as he left the courtroom. "I don't (mess) around. This guy deserves jail."

(ECF No. 1-2 at 90, Pg ID 95.)

After Mauro executed the assignment the next day, Judge Foster ordered his

release. (*See Jode Investments*, 2014 WL 1515267, at *5; ECF No. 33, Def.'s Mot.

Ex. 5, *Jode Investments* Docket at Pg ID 737.)

In June 2012, having granted the Club Parties' motions to dissolve the BT Entities, the court dismissed the remaining claims and closed the case. *See Jode Investments*, 2014 WL 1515267, at *5. The BT Parties moved for reconsideration, but the court struck the motion as untimely in July 2012. *See id.* at *6.

The parties cross-appealed. The BT Parties appealed various aspects of the trial court's decision, including the order to assign the liquor license and the order that Mauro be incarcerated for contempt. The Club Parties appealed the trial court's denial of their requests for costs and sanctions against the BT Entities. *See id.* at *1.

The Michigan Court of Appeals ruled on the cross-appeals in the April 17, 2014 opinion. Relevant to the instant case, the appellate court reversed the trial court's determination that Fifth Third had effectively transferred BT Investors' personal property (including the liquor license) to Marrocco and Fanelli, finding that the bank never took the affirmative steps necessary to dispose of the personal property after the BT Entities defaulted on the loan, and concluded that the trial court "erred when it order[ed] Burning Tree Investors to transfer those assets to a third party without compensation." *Id.* at *10. As to Mauro's contempt incarceration, the Court of Appeals stated simply: "The Burning Tree entities and Mauro ask this court to 'reverse' the trial court's order that Mauro be incarcerated for contempt. However, it is clear that Mauro is no longer incarcerated. Therefore, this claim of error is moot, and we decline to address it." *Id.* at *12.

9

After further proceedings on remand, the trial court held that the four members of the BT Entities—Mauro, Jode, DiMercurio, and Gesuale—were each entitled to 25% of the assets of the BT Entities, including the value of the liquor license, which the trial court valued at $653,280.68 in total. (*See* Pl.'s Resp. Ex. 4, July 8, 2016 Macomb County Circuit Court Opinion at 2-20, Pg ID 994-1012.)

## B.  Procedural History

Mauro filed the initial Complaint in this action against Macomb County and Marrocco in the Macomb County Circuit Court on April 18, 2016 (ECF No. 1-2 at 4-30, Pg ID 9-35 ("**Compl.**")). Mauro alleged that his "wrongful imprisonment was calculated to intentionally cause [him] to suffer emotional distress, humiliation, embarrassment and loss of reputation," and that it did in fact have that effect. (Compl. ¶¶ 51, 53-54.) He further alleged that "Defendant Marrocco's comments in *The Macomb Daily* article were intended to further cause Mauro to suffer emotional distress, as well as public shame, humiliation, embarrassment and loss of reputation," and that the comments had their intended effect as well. (Compl. ¶ 52.)

The Complaint also set forth the following allegations:

55. Further, while the case filed by defendant Marrocco and his business entities was pending in the Court of Appeals and on remand in the circuit court, defendant Marrocco used his position as Public Works Commissioner to delay projects and/or threatened to delay projects, in which Mauro as [*sic*] involved in any way, including projects in which Mauro had no ownership interest but had been hired as the engineer for the project.

56. Defendant Marrocco's actions were taken on behalf of himself and the County to retaliate against Mauro for filing a counterclaim against him and for pursuing his First Amendment rights to seek redress in a court of law by prosecuting his appeal in the Court of Appeals and by litigating his case on remand to the circuit court.

57. Defendants continued the wrongful and unconstitutional harassment of Mauro since 2011 until this day.

(Compl. ¶¶ 55-57.)

The Complaint alleged three causes of action: violation of federally protected rights under 42 U.S.C. § 1983 (Count I), false imprisonment (Count II), and intentional infliction of emotional distress ("**IIED**") (Count III). (Compl. ¶¶ 61-84.)

The action was timely removed to this Court on April 28, 2016. (ECF No. 1, Notice of Removal.) After answering the Complaint and then amending his answer (ECF Nos. 4, 7), Marrocco moved for leave to file a second amended answer to the Complaint in order to assert three new affirmative defenses (ECF No. 13), which Mauro opposed (ECF No. 14). The Court granted Marrocco's motion for leave to amend on October 27, 2016 (ECF No. 15), and Marrocco filed his amended answer on November 2, 2016 (ECF No. 17).

On July 27, 2017, after the parties completed discovery, Marrocco (in his individual capacity only) filed the instant Motion for Summary Judgment. (ECF No. 33, Def.'s Mot.) Mauro filed a timely Response. (ECF No. 35, Pl.'s Resp.) Marrocco did not file a reply brief.

On October 11, 2017, the parties filed a stipulated order dismissing all claims against Macomb County and all claims against Marrocco in his official capacity. The stipulated order further stated that "the Court shall retain jurisdiction of this case, and that this Stipulation and Order does not resolve the last pending claim in this case, including the claims pled by Plaintiff Simone Mauro against Defendant Anthony V. Marrocco, in his individual capacity." (ECF No. 37.)

The Court held a hearing on Marrocco's Motion for Summary Judgment on November 30, 2017. At the hearing, the Court advised the parties' attorneys that they would be permitted to file supplemental briefs on the issues of qualified immunity, and the impact of the dismissal of the official-capacity claims against Marrocco on the instant Motion for Summary Judgment. Mauro filed a supplemental brief on December 4, 2017. (ECF No. 39, Pl.'s Supp. Br.) Marrocco did the same on December 8, 2017. (ECF No. 40, Def.'s Supp. Br.)

## II.  LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich.

2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff."

*Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.    DISCUSSION

For the reasons set forth below, Defendant Marrocco is entitled to summary judgment on all claims asserted in this action with one exception: Plaintiff Mauro's First Amendment retaliation claim asserted under 42 U.S.C. § 1983. As to that claim, Mauro has adduced sufficient evidence to demonstrate the existence of a genuine issue of material fact that precludes summary judgment.

### A.    42 U.S.C. § 1983 (Count I)

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988), and *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (quoting *United States*

*v. Classic,* 313 U.S. 299, 326 (1941)).

Even if these elements are met, a defendant in a § 1983 action may be insulated from liability by the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity requires the court to determine: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." *Pearson,* 555 U.S. at 232 (citations omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. If the two prongs are met, the court must then determine "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

When a state defendant invokes the doctrine of qualified immunity, the plaintiff "bear[s] the burden of showing the claimed right was clearly

established." *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009). The plaintiff need not cite "'a case directly on point' [to demonstrate] that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kent v. Oakland Cty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Stanton v. Sims,* 134 S. Ct. 3, 5 (2013)). The inquiry requires the plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" in order to show that the right was clearly established. *Hidden Village, LLC v. City of Lakewood, Ohio,* 734 F.3d 519, 529 (6th Cir. 2013).

Here, Marrocco argues that he cannot be held liable under § 1983 for any of his actions in prosecuting the state-court litigation because none of those actions were done under color of law. He then argues that insofar as Mauro's § 1983 claim is premised on the allegation that Marrocco used his authority as Macomb County Public Works Commissioner to delay projects that Mauro was involved with, the claim fails because Mauro has no constitutional right to work as a design engineer on any particular project. Marrocco also argues that Mauro has failed to support this First Amendment theory of his § 1983 claim with sufficient evidence.

Mauro counters that he does in fact have constitutionally protected interests in working as a developer or design engineer and in obtaining permits for construction projects, and adds that Marrocco's argument overlooks another constitutional right: Mauro's right of access to the courts under the First

Amendment. Mauro maintains that this right was infringed when Marrocco used the powers of his office to retaliate against him for pursuing the appeal of the state trial court's adverse ruling on Mauro's counter-claims against Marrocco (and the other Club Parties) concerning the personal property of BT Investors.[3] Mauro identifies two adverse actions that Marrocco took against him. First, Marrocco "as the Public Works Commissioner, purposely delayed the issuance of permits on construction projects in which Plaintiff had any involvement." (Pl.'s Resp. at 17, Pg ID 933.) Second, Marrocco "used his position in the government as Public Works Commissioner as leverage to have the state circuit court incarcerate Plaintiff for contempt of court based on Marrocco's false assertions to the state circuit court." (Pl.'s Resp. at 17, Pg ID 933.)

Mauro has cited no authority establishing that he has a due process interest in working as a developer or design engineer, or in obtaining permits for construction projects. He relies on a general citation to *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), for this argument, but that reliance is misplaced. In *Roth*, the Supreme Court recognized that some interests are sufficiently protected by the Due

---

[3] While the allegations in the Complaint focused chiefly on the contempt incarceration, Mauro did also allege that Marrocco's actions "in retaliation for Mauro having filed a counterclaim against him and for Mauro having pursued his First Amendment rights to seek redress in a court of law by prosecuting his appeal in the Court of Appeals and by litigating his case on remand to the circuit court" violated the First Amendment. (Compl. ¶ 68.) He has therefore preserved this basis for his § 1983 claim.

Process Clause of the Fourteenth Amendment that certain procedures may be required before a person can be deprived of them. The Court divided these interests into two categories: liberty interests and property interests. *See id.* at 570-72.

When it comes to property interests, *Roth* makes clear that a constitutionally protected property interest cannot be based on "an abstract need or desire" or on "a unilateral expectation," but must instead be grounded in "a legitimate claim of entitlement." *Id.* at 577. Courts "look to 'existing rules or understandings that stem from an independent source such as state law' to determine whether a benefit rises to the level of a protected property interest." *Crosby v. Univ. of Kentucky*, 863 F.3d 545, 552 (6th Cir. 2017) (quoting *Roth*, 408 U.S. at 577). "Although the Constitution protects property interests, it does not create them. The interest must come from some other source—a state statute, a formal contract, or a contract implied from the circumstances, for example." *Springs v. U.S. Dep't of Treasury*, 567 F. App'x 438, 448 (6th Cir. 2014) (citing *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004)). "The essential inquiry is whether there exists a 'mutually explicit understanding[ ] that support[s] [the plaintiff's] claim of entitlement.'" *Crosby*, 863 F.3d at 552 (alterations in original) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). Here, Mauro has offered no evidence that he had a legitimate claim of entitlement to any specific benefit of which he was deprived, and for that reason he has not shown that he had a constitutionally protected property interest under *Roth*.

The liberty interests recognized in *Roth* come into play when a state actor makes a "charge against [an individual] that might seriously damage his standing and associations in his community," or when it "impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573. In other words, "[t]he Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in their 'reputation, good name, honor, and integrity.'" *Crosby*, 863 F.3d at 555 (quoting *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002)). Sixth Circuit precedent makes equally clear, however, that to implicate the Due Process Clause, the stigmatizing action "must be made in conjunction with the plaintiff's termination from employment." *Id.* (quoting *Quinn*, 293 F.3d at 320). Thus, even if Mauro suffered reputational harm as a result of his contempt incarceration, it is not the sort of harm that is constitutionally protected under *Roth* and the decisions interpreting it.

The larger problem with Mauro's § 1983 claim, to the extent that it is based on reputational harm (or indeed any other harm) that he suffered by virtue of the contempt incarceration, is that there is no evidence that anything Marrocco did in the context of the state-court litigation was "under color of law." "[B]efore a defendant may be held liable under section 1983, that defendant must first *possess* power by virtue of state law, then *misuse* that power in a way that violates federal constitutional rights." *Cherrington v. Skeeter*, 344 F.3d 631, 644 (6th Cir. 2003)

(emphasis added) (internal quotation marks omitted) (quoting *Christian v. Belcher*, 888 F.2d 410, 414 (6th Cir. 1989)). Here, the record makes clear that Marrocco participated in the state-court litigation only on behalf of himself and Jode, and there is no indication that that participation was in any way connected with his position as Macomb County Public Works Commissioner. And while Mauro summarily contends that Marrocco "used his position in the government as Public Works Commissioner as leverage to have the state circuit court incarcerate Plaintiff for contempt of court" (Pl.'s Resp. at 10, Pg ID 933), he has produced no evidence of this whatsoever. As discussed in greater detail *infra* in the context of Mauro's false imprisonment claim, any limited degree to which Mauro's contempt incarceration can be attributed to Marrocco's actions is attenuated by the fact that Judge Foster exercised his own judgment in ordering the incarceration.

At the same time, Mauro has advanced enough evidence to survive summary judgment on his § 1983 claim in one respect: the extent to which that claim is premised on a First Amendment retaliation theory, based on the allegations (and now evidence) that Marrocco used his position to frustrate Mauro's professional endeavors in retaliation for Mauro's pursuit of the appeal in the Michigan courts. To prevail on a First Amendment retaliation claim, a plaintiff must ultimately prove three things: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary

firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

The first element is clearly satisfied in this case, as "[t]he filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment." *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Thaddeus-X*, 175 F.3d at 396). *See also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the [First Amendment's] Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. '[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'") (quoting *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 896–897 (1984)); *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 645 (6th Cir. 2015) (noting that "appealing an adverse judgment and speaking out against public officials are well-established as protected conduct" under the First Amendment) (citing *Leonard v. Robinson*, 477 F.3d 347, 357 (6th Cir. 2007)).

Sixth Circuit precedent also clearly establishes that the denial of permits or licenses in retaliation for the exercise of the right to file a lawsuit to redress grievances constitutes an "adverse action" for the purposes of a First Amendment

retaliation claim. In *Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623 (6th Cir. 2013), the plaintiffs, owners of an adult-entertainment establishment, had alleged that the state defendants had implemented a policy of denying third parties licenses to hold "millionaire parties"[4] at the plaintiffs' establishment, and that the state defendants did so in retaliation for the plaintiffs' having challenged certain advertising laws in court. *See id.* at 627-29. The Sixth Circuit held that this allegation was sufficient as a matter of law to state a First Amendment retaliation claim, and addressed the "adverse action" prong of the standard by explaining that "it is not implausible that the denial of necessary licenses to organizations seeking to hold millionaire parties at [the plaintiffs' establishment] might cause economic injury sufficient to deter Plaintiffs from filing future litigation." *Id.* at 632. (citing *Siggers–El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005) ("[S]ince there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect] need not be great in order to be actionable.") (internal quotation marks and citation omitted)). *See also Holzemer v. City of Memphis*, 621 F.3d 512, 524-25 (6th Cir. 2010) (finding the "adverse action" prong of the standard satisfied where a city

---

[4] "A 'millionaire party' is 'an event at which wagers are placed upon games of chance customarily associated with a gambling casino through the use of imitation money or chips that have a nominal value equal to or greater than the value of the currency for which they can be exchanged.' Mich. Comp. Laws § 432.103a(8). Millionaire-party licenses are limited in scope and duration, and may be issued to a 'qualified organization' for up to four consecutive days. *Id.* § 432.110b." *Top Flight Entertainment*, 729 F.3d at 627–28.

official "engaged in delay tactics and hostility toward the plaintiffs" in connection with a permit renewal process, after concluding that "[s]uch behavior might deter citizens from petitioning city council if petitioning would lead to a failure to obtain necessary renewal permits and the de facto closure of their business"). These authorities leave no doubt that the denial of licenses or permits to a person (or to a person's potential customers or clients) because of that person's protected activity constitutes adverse action for First Amendment retaliation purposes.

These decisions demonstrate that if Marrocco used his position to frustrate Mauro's professional opportunities or endeavors in retaliation for pursuing the counter-claims again Marrocco and the other Club Parties, or as a threat to deter him from doing so, then this conduct could support a First Amendment retaliation claim. Indeed, those authorities are unambiguous enough to justify a conclusion that it is clearly established that such activity on Marrocco's part would violate Mauro's First Amendment rights. The question for the purposes of the qualified immunity analysis at the summary judgment stage thus becomes whether Mauro has offered enough evidence that, drawing all reasonable inferences in the light most favorable to Mauro (the non-movant), a reasonable jury could find that Marrocco engaged in activity that was objectively unreasonable in light of Mauro's clearly established rights.

Mauro's evidence is as follows. In response to an interrogatory requiring him to identify specific projects that Marrocco used his authority to delay, Mauro stated

that with respect to the "Plumbrook Subdivision, which is located on Utica Road in the City of Sterling Heights," Marrocco "wrongfully demanded additional, unnecessary and costly engineering work. Later, Marrocco claimed to have a conflict, and obtained a court order to have the St. Clair County Department of Public Works issue any permits and/or approvals. Plaintiff was the Design Engineer for the Plumbrook Subdivision Project." (Def.'s Mot. Ex. 13, Response to Interrogatories at 1-2, Pg ID 834-35.) Mauro also stated more generally in his response to Marrocco's interrogatories that "he lost numerous business opportunities after Defendant Marrocco made it known to other developers and engineering professionals that any project in which Plaintiff was involved would not be approved." (Response to Interrogatories at 2, Pg ID 835.)

Additionally, Mauro made the following factual averments in an affidavit attached to his Response to Marrocco's Motion for Summary Judgment:

14. At oral argument [in the *Jode Investments* appeal] on December 10, 2012, the questioning of the [Michigan Court of Appeals] panel members focused on the fact that at no place in the settlement agreement between defendant Marrocco and Fifth Third Bank did it provide that defendant Marrocco, or any of his companies, bought the personal property of Burning Tree Investors, LLC.
15. From that point until the Court of Appeals decision came out, I was pressured to drop the lawsuit if I ever wanted a permit from the Public Works Commissioner again. On one occasion in February, 2014, as I was having lunch at Luciano's in Sterling Heights, Dino Bucci, who worked directly for defendant Marrocco at the Public Works Commission, came to my table and sat down. He said to me that "the

24

boss" was very angry that I was pursuing this appeal, and that if I ever wanted to get anything approved at Public Works, I needed to drop the appeal and offer a settlement to defendant Marrocco. When I seemed reluctant, Mr. Bucci said, "Simone, if you ever want to work in this County again, you'll drop this case."

16. This upset me and intimidated me so much that I did go to defendant Marrocco's office at the Public Works Commission and tried to meet with him to discuss this. Defendant Marrocco said that I had to dismiss the appeal before he would have any discussion with me about anything, which I understood to mean any permit or other requests for approval from the Public Works Commission.

(Pl.'s Resp. Ex. 5, Affidavit of Simone Mauro ¶¶ 14-16.)

As to Mauro's claim that Marrocco caused delays in the Plumbrook Subdivision Project, Marrocco argues that Mauro did not have an ownership interest in the project, and that any such interference by Marrocco would not implicate any constitutional right of Mauro's in any case, since Mauro "has to prove that he had a constitutional right to be the design engineer on the Plumbrook Project."[5] (Def.'s Mot. at 10, Pg ID 652.) Both arguments lack merit. First, *Top Flight Entertainment*

---

[5] Marrocco's counsel also suggested at oral argument that the fact that Mauro was never actually discouraged from pursuing the appeal in the Michigan courts independently defeats his retaliation claim. The Sixth Circuit expressly rejected a similar argument in *Holzemer*. *See Holzemer*, 621 F.3d at 525 ("[The state official defendant] argues that there was no adverse action because the plaintiffs were not actually deterred from seeking redress. That the plaintiffs themselves were not deterred, without more, is not sufficient to prove a lack of adverse action. We have previously stated that 'the issue is whether a person of ordinary firmness would be deterred, not whether the [plaintiff] himself actually was deterred.'") (quoting *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008)). So too, here.

and *Holzemer* make clear that to show an adverse action in the licensure and permit approval context, it is not required that a plaintiff have a direct ownership interest in the licenses or permits at issue, so long as the pecuniary harm that the plaintiff suffers from the denial of the licenses or permits would be enough to "deter a person of ordinary firmness from continuing to engage" in protected conduct. *Top Flight Entertainment*, 729 F.3d at 631 (quoting *Wurzelbacher v. Jones–Kelley*, 675 F.3d 580, 583 (6th Cir. 2012)). Second, Marrocco's contention that Mauro must show that he had a due process right to work as a design engineer on the Plumbrook Subdivision Project mischaracterizes the constitutional right at issue, which is Mauro's First Amendment right to seek redress of grievances in court. Whether or not that right was infringed by retaliatory conduct committed by Marrocco, acting as Macomb County Public Works Commissioner, is the dispositive issue here.

Marrocco also points out that besides the statements in his interrogatory responses, Mauro has provided no specific evidence of any acts of interference by Marrocco with regard to the Plumbrook Subdivision Project. Mauro's interrogatory responses themselves do constitute at least some evidence for summary judgment purposes. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[Federal Rule of Civil Procedure] 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment."). But it is fair to say that the interrogatory responses are not strong

evidence in and of themselves. It is also far from clear how Mauro's assertion that "Marrocco claimed to have a conflict, and obtained a court order to have the St. Clair County Department of Public Works issue any permits and/or approvals" (Def.'s Mot. Ex. 13, Response to Interrogatories at 1-2, Pg ID 834-35) shows retaliation. (If anything, it would seem to weigh in the opposite direction.) In light of all this, it is dubious whether the interrogatory responses would be enough by themselves to permit a trier of fact to find for Mauro on a First Amendment retaliation claim.

Together with the statements in Mauro's affidavit, however, they create a genuine issue of material fact. The interrogatory responses alone do not evidence a direct link between Mauro's protected activity and Marrocco's actions, and the only indications of retaliation that they contain are broad and unspecific: Mauro's claim, for example, that he "lost numerous business opportunities after Defendant Marrocco made it known to other developers and engineering professionals that any project in which Plaintiff was involved would not be approved." (Response to Interrogatories at 2, Pg ID 835.) But the averments in Mauro's affidavit provide that direct link—in particular, Bucci's statement that if Mauro "ever wanted to get anything approved at Public Works, [he] needed to drop the appeal and offer a settlement" to Marrocco; Bucci's statement that "'if you ever want to work in this County again, you'll drop this case'"; and Mauro's account of meeting with Marrocco and being told that he "had to dismiss the appeal before [Marrocco] would

have any discussion with [him] about anything." (Mauro Aff. ¶¶ 15-16.) These averments contribute enough specific factual material to the equation that a reasonable jury could find on this record that Marrocco retaliated against Mauro for exercising his First Amendment rights under clearly established law.

Of course, this conclusion requires that the statements in the affidavit are fair game for consideration by this Court on summary judgment. Marrocco argues that they are not because they are hearsay, and he cites *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994), for the proposition that "hearsay evidence cannot be considered on a motion for summary judgment." *Id.* at 226. The relevant inquiry, however, is not simply whether the proffered evidence is hearsay—it is whether the proffered evidence is inadmissible as hearsay. This is based on the principle that "the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Such 'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Id.* (internal quotation marks omitted) (quoting *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007)). Accordingly, if what appears to be hearsay evidence is in fact admissible—either because it is not actually hearsay, or because it fits within a recognized exception to the hearsay rule—then that evidence may be

properly considered by the court on summary judgment. *See, e.g., Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 944 (6th Cir. 2016) (holding that the district court erred in excluding from consideration on summary judgment "statements [that were] admissions of a party-opponent, admissible under the hearsay exception in Federal Rule of Evidence 801(d)(2)"); *Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840, 843–44 (6th Cir. 2017) (holding that hearsay evidence that fell under the "business records" exception of Federal Rule of Evidence 803(6) could be considered on summary judgment); *Harris v. World Fin. Network Nat. Bank*, 867 F. Supp. 2d 888, 898–99 (E.D. Mich. 2012) (same).

Mauro's averments in his affidavit regarding statements by Bucci and Marrocco can be considered at the summary judgment stage in this case because under the Federal Rules of Evidence, they are not hearsay at all. Rule 801(d)(2) provides that a statement is not hearsay if it meets the following conditions:

> The statement is offered against an opposing party and:
> (A) was made by the party in an individual or representative capacity;
> (B) is one the party manifested that it adopted or believed to be true;
> (C) was made by a person whom the party authorized to make a statement on the subject;
> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).

All of the challenged statements in Mauro's affidavit are offered against Marrocco, the opposing party. Mauro's averment that "Marrocco said that I had to dismiss the appeal before he would have any discussion with me about anything" (Mauro Aff. ¶ 16) fits within Rule 801's hearsay exclusions, as it was "made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). *See also United States v. Ford*, 761 F.3d 641, 651 (6th Cir. 2014) ("Out-of-court statements made by a party-opponent are an exception to the general hearsay rule.").

Mauro's averments regarding Bucci's statements, meanwhile, fit within Rule 801(d)(2)(D), which excludes from the definition of hearsay any statement that is offered against a party and that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." In determining whether Rule 801(d)(2)(D) applies, a court must examine whether the statement's proponent has put forward "'sufficient evidence' to conclude that the person who made the statement is in fact 'a party or an agent'" of the party against whom the statement is offered. *Med. Ctr. at Elizabeth Place, LLC*, 817 F.3d at 944 (quoting *Davis v. Mobil Oil Expl. & Prod. Se., Inc.*, 864 F.2d 1171, 1174 (5th Cir. 1989)). The court must also answer the "crucial question [of] whether there is evidence that the unidentified declarants were speaking on a matter within the scope of their employment." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 578 (6th Cir. 2012) (alterations in original) (internal quotation marks and citations omitted). Further,

> [i]n answering that question, the statement must be considered but does not by itself establish . . . the existence or scope of the relationship under [Rule 801(d)(2)(D)]. Outside evidence sufficient to satisfy Rule 801(d)(2)(D)'s scope requirement could come from the circumstances surrounding the statement, such as the identity of the speaker [or] the context in which the statement was made.

*Id.* (alterations in original) (internal quotation marks and citations omitted).

Here, there is sufficient evidence for the Court to conclude both that Bucci was an agent of Marrocco at the relevant time, and that he was speaking within the scope of his employment. Mauro avers that Bucci "worked directly for defendant Marrocco at the Public Works Commission," that Bucci stated that "'the boss' was very angry" at Mauro's pursuit of the appeal, and that he informed Mauro that he would have to drop the case if he "ever wanted to get anything approved at Public Works." (Mauro Aff. ¶ 15.) And although Marrocco has disputed the admissibility of these statements, he has not submitted any evidence to the contrary. Thus, the statements that Mauro avers Bucci made, as well as the circumstances that Mauro avers attended those statements, constitute unrebutted evidence that at the time he made those statements, Bucci was an employee or agent of Marrocco, and was speaking on a topic within the scope of his employment or agency.

Accordingly, although Marrocco is entitled to summary judgment on Mauro's § 1983 claim to the extent that it is premised on a Fourteenth Amendment due process theory, Mauro has raised genuine issues of material fact concerning his §

1983 claim insofar as it is premised on a First Amendment retaliation theory, and these issues preclude summary judgment on that theory of Mauro's § 1983 claim.

## B.    False Imprisonment (Count II)

Mauro's false imprisonment claim fails as a matter of law.

Under Michigan law, "[t]he elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement." *Bletz v. Gribble*, 641 F.3d 743, 758 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Walsh v. Taylor*, 263 Mich. App. 618, 627 (2004)). "The confinement, however, 'must be "false," i.e., without right or authority to do so.'" *Smith v. Twp. of Prairieville*, 194 F. Supp. 3d 658, 671 (W.D. Mich. 2016) (quoting *Tumbarella v. Kroger Co.*, 85 Mich. App. 482, 489 (1978)).

As regards Mauro's false imprisonment claim, Marrocco points out that Mauro admitted in his discovery responses that Marrocco did not in any way use his hands or body to physically restrain Mauro, and further admitted that Judge Foster had the authority to lawfully imprison individuals for contempt of court. (*See* Def.'s Mot. at 21, Pg ID 654 (citing Ex. 16, Response to Requests for Admissions at 3-4, Pg ID 871-72).) Marrocco also highlights the fact that the Michigan Court of Appeals did not reverse the trial court on its decision to hold Mauro in contempt.

Mauro makes a few distinct arguments in response. First, he maintains that the BT Parties filed a motion for reconsideration regarding the assignment of BT Investors' personal property on February 13, 2013, and that that motion was still pending when the trial court entered its show-cause order. Second, he argues that the Michigan Court of Appeals held in the April 2014 opinion that, in his words, "there was absolutely no evidence that Fifth Third assigned title to the personal property to Marrocco and his companies, and that Marrocco and his companies knew that fact . . . ." (Pl.'s Resp. at 22, Pg ID 938.) Third, Mauro argues that emails between Fifth Third's attorneys and the Club Parties' attorneys show knowledge on their part that the bank never owned BT Investors' personal property and thus could not legally transfer it to the Club Parties, but that Marrocco nevertheless "through his lawyers, continued to claim falsely" that he and Fanelli had acquired the personal property from the bank, resulting in the trial court's decision which Mauro was ultimately held in contempt for failing to comply with.[6] (Pl.'s Resp. at 23, Pg ID 939.)

In short, Mauro argues that the order to show cause was premature, that his legal position in the proceedings was later vindicated by the Michigan Court of

_____

[6] In his Response, Mauro cites "Exhibit 7," "Exhibit 8," and "Exhibit 9" to support his argument concerning the knowledge of Marrocco's attorneys as reflected in their emails, but no such exhibits are attached to his brief. This omission is ultimately immaterial because for the reasons discussed below, *any* degree of such "knowledge" makes no difference, since Judge Foster made an independent judgment in jailing Mauro for contempt.

Appeals, and that Judge Foster's decision to hold Mauro in contempt was partly the product of spurious arguments made by Marrocco's attorneys. None of these arguments address the fundamental problem with Mauro's false imprisonment claim, however: the act by Marrocco (and the other Club Parties) that Mauro claims resulted in his false imprisonment—i.e., their motion for an order to show cause why Mauro should not be held in contempt for failing to comply with a court order—could in no way have brought about Mauro's imprisonment without subsequent acts—i.e., the granting of that motion and the ordering of Mauro's incarceration—by Judge Foster, who is not a party to this lawsuit.

Michigan law recognizes the possibility that a person who instigates, rather than actually physically commits, an act of false imprisonment can in certain circumstances be held liable for the tort of false imprisonment. *Handlon v. Rite Aid Servs., LLC*, 513 F. App'x 523 (6th Cir. 2013), is instructive on this point. In *Handlon*, the Sixth Circuit affirmed summary judgment in favor of an employer on a false imprisonment claim by a former employee, who had alleged that a manager had provided the police with false information leading to her arrest. Noting that the manager could only be held liable for the arrest if the arresting officer "acted at [the manager's] direction and not through an exercise of [the officer's] own judgment," *id.* at 530, the court analyzed Michigan law on the issue as follows:

> In [*Lewis v. Farmer Jack Div., Inc.*, 415 Mich. 212, 327 N.W.2d 893, 894–95 (1982)], the Michigan Supreme Court focused on the degree of

34

direction a private citizen exercises over an official arrest: "It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them." *Lewis,* 327 N.W.2d at 895 n. 3 (quoting Restatement (Second) of Torts, § 45A cmt. c). The court held that, where a store employee contacted police to report that she identified the man responsible for a previous robbery and the man was arrested based on the information the employee provided, "[t]he police acted on and in the exercise of their own judgment and not at the direction of [the employee] or the manager." *Id.* at 895. The court further noted that the employee "communicated facts and circumstances to the officer, her perception that Lewis was the robber. The officer was left to act on his own judgment and evidently acted on his own judgment in arresting Lewis." *Id.* at 895 n. 3. In contrast, the Michigan Supreme Court held in *Maliniemi v. Gronlund,* 92 Mich. 222, 52 N.W. 627, 627–28 (1892), that an officer acted upon the judgment of a private citizen where the citizen directed the officer to an individual matching the description of a suspect and the plaintiff was arrested immediately without verifying his identity in any way.

*Handlon*, 513 F. App'x at 530.

Proceeding then to apply the "'judgment and direction' analysis suggested by *Gronlund* and *Lewis*," the Sixth Circuit in *Handlon* held that no reasonable jury could find for the plaintiff in the case at bar, since the evidence showed that the police officer arrested the plaintiff based on the manager's communication to the officer of "'facts and circumstances' and his 'perception' that [the employee] was responsible" for the theft for which she was then arrested. *Id.* The court concluded that the plaintiff could "point[] to no evidence in the record that [the manager]

commanded the officer to arrest [the plaintiff], or that she was arrested simply at [the manager's] request, rather than upon a weighing of his statements. These facts are similar to the facts in *Lewis* and support the same result." *Id.* at 530-31.

The same principles apply here. Judge Foster ordered that BT Investors' personal property be transferred to the Club Parties, Marrocco and the other Club Parties moved for a contempt order when Mauro failed to comply with that order, and after Mauro still refused to comply at the show-cause hearing, Judge Foster ordered him held in contempt. Judge Foster acted on his own judgment—indeed, was *enforcing* his own judgment—rather than taking any action solely at the direction of Marrocco, and that plain fact is not affected by any degree of "knowledge" on Marrocco's part of the bank's inability to transfer the property, or by the fact that there was a motion for reconsideration still pending when the court decided to issue the order to show cause. Mauro cites no Michigan authority for the proposition that where a litigant moves a court to hold a party in contempt for failure to abide by a court order, and the court grants that motion after a hearing, the movant can be held liable for false imprisonment.[7] Mauro's false imprisonment claim fails

_____

[7] Mauro cites only one case to support his assertion that the fact that "Plaintiff was ordered jailed by a judge does not absolve Marrocco from liability" (Pl.'s Resp. at 21, Pg ID 937), but that case is unavailing to him. He quotes *Doak v. Springstead*, 284 Mich. 459 (1938), in which the Michigan Supreme Court stated in the context of a false imprisonment claim that "[a] conviction of the accused is conclusive evidence of probable cause, unless it was obtained by fraud or unfair means, which may be shown in rebuttal; and this is true though afterwards, on appeal, the

as a matter of law, and Marrocco is entitled to summary judgment on it.

## C.     Intentional Infliction of Emotional Distress (Count III)

Mauro's claim for intentional infliction of emotional distress ("**IIED**") also fails as a matter of law.

An IIED claim "requires a plaintiff to show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Jones v. Muskegon Cty.*, 625 F.3d 935, 948 (6th Cir. 2010) (quoting *Vredevelt v. GEO Group, Inc.*, 145 F. App'x 122, 135 (6th Cir. 2005) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985)).). "Such conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *Graham v. Ford*, 237 Mich. App. 670, 674 (1999)). Indeed,

> [i]t is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. . . . The test is whether "the recitation of the

conviction is set aside or the accused acquitted." (Pl.'s Resp. at 21-22, Pg ID 937-38 (quoting *Doak*, 284 Mich. at 460).) The central proposition of *Doak* is that an acquitted criminal defendant cannot sue the officer that arrested him because he was later acquitted, and the *Doak* court dismissed the false imprisonment claim that was before it for that reason. *Doak* has no relevance to this case.

facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id.* (internal citations omitted) (quoting *Graham*, 237 Mich. App. at 674-75).

Mauro makes only one argument to the effect that Marrocco's conduct was extreme, outrageous, or otherwise beyond all possible bounds of decency: "Plaintiff submits that lying to a circuit court judge and misrepresenting the facts in order to have the judge order Plaintiff incarcerated until such time that Plaintiff signed over possession of personal property to which Marrocco knew he had no entitlement constitutes extreme and outrageous conduct." (Pl.'s Resp. at 25, Pg ID 941.) Mauro concludes, summarily, that "Marrocco intentionally set forth this action into motion, and caused Plaintiff's incarceration." (Pl.'s Resp. at 25, Pg ID 941.)

The argument does not carry the day. Mauro has offered no evidence that Marrocco "[lied] to a circuit court judge" at any point in the state-court litigation. The only apparent basis for his claim that Marrocco lied to the court seems to be his contention that Marrocco knew "that [the bank] never owned the personal property, and therefore could not sell it" (Pl.'s Resp. at 16, Pg ID 939), and thus that it was somehow an act of dishonesty to argue before the court that the Club Parties were entitled to the property. Even if this Court were to accept the factual premise of Mauro's argument—and the Court cannot, since the exhibits Mauro cites in support of it are not attached to his brief—the argument is flawed, because the "knowledge"

that Mauro imputes to Marrocco and his attorneys in the state-court litigation is not factual knowledge but a legal conclusion. Thus, even if Marrocco and his attorneys believed that they "knew" to a certainty that the bank never effectively transferred the property, they could not "know" this after Judge Foster had made a legal determination to the contrary, even if that determination was later reversed on appeal. The motion for an order to show cause was simply a mechanism to enforce this legal determination.

Apart from this, Mauro offers no evidence that the motion for an order to show cause, even if it were somehow a bad-faith act, is even attributable to Marrocco. The ex parte motion for an order to show cause (*see* ECF No. 1-2 at 55-61, Pg ID 60-66) was filed on behalf of several different parties and was signed by three different attorneys. Marrocco was not one of the signatories, nor is there any evidence that he is a licensed attorney at all. Absent at least a modicum of evidence of further personal involvement by Marrocco, the clear inference is that the motion for an order to show cause was filed by the Club Parties' attorneys because Judge Foster's prior determination regarding BT Investors' personal property established a legal basis for seeking the relief requested in the motion, notwithstanding the fact that that legal basis was later deemed to be erroneous by the Michigan Court of Appeals.

The parties also argue over whether the "severe emotional distress" prong of the IIED prima facie case is met, but the Court need not reach this issue. Even

drawing all reasonable inferences in Mauro's favor, a reasonable jury could not find that Mauro has proven an IIED claim, since there is no evidence on which a trier of fact could find that Marrocco—the only Defendant still in this action—undertook any actions that would constitute the "extreme and outrageous conduct" required to justify liability for intentional infliction of emotional distress.

## IV.    CONCLUSION

For the reasons stated above, the Court hereby DENIES Defendant Marrocco's Motion for Summary Judgment only insofar as it seeks dismissal of Plaintiff's § 1983 claim on a First Amendment retaliation theory. At the same time, the Court hereby GRANTS Defendant's Motion for Summary Judgment insofar as it seeks dismissal of Plaintiff Mauro's § 1983 claim on all other theories, and his state-law false imprisonment and IIED claims.

IT IS SO ORDERED.


Dated:  May 30, 2018                     s/Paul D. Borman
                                        Paul D. Borman
                                        United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 30, 2018.

                                        s/D. Tofil
                                        Deborah Tofil, Case Manager